UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                                                     :
LINDSAY JUNIOR BREEDEN,                                               :    09-CV-4995 (ARR)(JMA)
                                                                     :
                    Plaintiff,                                        :    NOT FOR ELECTRONIC
                                                                     :    OR PRINT PUBLICATION
       -against-                                                      :
                                                                     :    OPINION & ORDER
CITY OF NEW YORK; COMMISSIONER RAYMOND                               :
W. KELLY; P.O. LOUIS DUCCESCHI, *Shield #3030*;                       :
DETECTIVE MICHAEL BRAITHWAITE, *Shield #347*;                         :
DETECTIVE TIMOTHY O'BRIEN, *Shield #2610*;                            :
DETECTIVE MATTHEW WALKER, *Shield #1701*, *the*                       :
*individual defendants sued individually and in their official*       :
*capacities*,                                                         :
                                                                     :
                    Defendants.                                       :
                                                                     X
-------------------------------------------------------------------- 
ROSS, United States District Judge:

       Lindsay Junior Breeden ("plaintiff") brought suit pursuant to 42 U.S.C. §§ 1983, 1985,

and 1988 against the City of New York, Commissioner Raymond W. Kelly, and several

individual police officers for a number of alleged violations of his constitutional rights in

connection with his arrest and prosecution for the murder of Anthony Davis.  Now remaining

before this Court are plaintiff's claims against individual defendants Ducceschi, Braithwaite,

O'Brien, and Walker pursuant to § 1983 for (1) false arrest and imprisonment, (2) malicious

prosecution, and (3) denial of medical treatment.  The remaining defendants move for summary

judgment on all outstanding claims.  For the reasons stated below, defendants' motion is granted.

## BACKGROUND

       The following relevant facts are taken from the parties' statements pursuant to Local

Civil Rule 56.1 and, except as otherwise noted, are undisputed.  Even where plaintiff does not

dispute defendants' statements of fact, plaintiff objects to the majority of defendants' factual submissions on the grounds that they are supported by police reports that are inadmissible evidence.  As will be discussed below, the submissions on which defendants rely are admissible as evidence in this action.  Accordingly, where plaintiff asserts no other objection to dispute a fact, the Court will regard such fact as undisputed.  See Cooper v. City of New Rochelle, 925 F. Supp. 2d 588, 605 (S.D.N.Y. 2013).  Otherwise, all facts are viewed in a light most favorable to plaintiff as the non-moving party.

On November 22, 2006, at approximately 7:26 p.m., Anthony Davis was shot in the arm, back, and leg outside of 3407 Church Avenue in Brooklyn, New York.  Defs. Facts ¶ 1.  Davis died from his gunshot wounds.

Also on the evening of November 22, 2006, plaintiff was brought to Coney Island Hospital with a gunshot wound to his knee, though there is some confusion in plaintiff's own facts as to whether this was his left or right knee.  Id. ¶ 2; Pl. Facts ¶¶ 2, 42.  Defendants assert that plaintiff was brought to the hospital at 7:57 p.m., Defs. Facts ¶ 2, while plaintiff asserts that he arrived at the hospital at 7:52 p.m., Pl. Facts ¶ 43, though this timing difference has virtually no bearing on the matters at issue.  Defendants also assert that it was a person by the name of Keith Moore who brought plaintiff to the hospital.  Defs. Facts ¶ 2.  Plaintiff appears to contest whether the document relied on by defendants indicates that Keith Moore brought him to the hospital but does not appear to dispute the fact that Keith Moore did in fact bring him to the hospital.  Pl. Facts ¶ 2.

Relying on New York Police Department ("NYPD") interview follow up reports, defendants assert that plaintiff and Moore initially told police officers that they had met up at

Church Avenue and Nostrand Avenue at 7:10 p.m. and boarded a bus to Coney Island, where they planned to meet some girls. Defs. Facts ¶ 4.  According to one report, Moore told a police officer that he and plaintiff were walking through a parking lot at 3415 Neptune Avenue in Coney Island when they heard people arguing and heard gunshots and that, as they turned to run back to the street, Moore saw that plaintiff had been shot.  Id. ¶ 5; Decl. of David M. Pollack ("Pollack Decl."), Ex. D.  Plaintiff and Moore further told police that they took a black cab to Coney Island Hospital.  Defs. Facts ¶ 6.

According to police reports submitted by defendants, police interviewed a number of people who were present near 3415 Neptune Avenue on the night of November 22, 2006, and none of the people interviewed reported seeing or hearing anything related to a confrontation or gunshots in the area that evening.  Defs. Facts ¶ 7.  Police officers also searched the parking lot with Keith Moore that night but neither recovered shell casings nor found any damage to automobiles that would indicate a gun fight.  Id. ¶ 8; Pollack Decl., Ex. K.

Also according to police reports submitted by the defendants, defendant Detective Braithwaite interviewed Keith Moore at the 67th Precinct around 2:30 a.m. on November 23, 2006.  Defs. Facts ¶ 9.  At that time, Moore admitted to defendants Detective Braithwaite and Detective Walker that the story he had previously given to police was false and that it had been fabricated because plaintiff did not want to reveal the actual location where he had been shot.  Id. ¶ 10.  Moore told police that he had actually received a phone call informing him that plaintiff had been shot and asking him to take plaintiff to the hospital.  Id. ¶ 11.  He indicated that he had met plaintiff at the corner of Fairview Place and Martenese Street before going with him to Coney Island Hospital, id. ¶ 12, even though there were other hospitals closer to that location.

Again relying on police reports and a written statement made by an individual named Fonzie Fortune on November 24, 2006, defendants assert that Detective Braithwaite interviewed Fortune at approximately 4:00 p.m. on November 24, 2006.  Defs. Facts ¶ 13.  Fortune's interview was memorialized in a taped statement made at 7:24 p.m. that same day.  Id. ¶ 32.  During that interview, Fortune told Detective Braithwaite that he had gone to a grocery store on the corner of East 34th Street and Church Avenue with Anthony Davis on the evening of November 22, 2006.  Id. ¶ 14.  After Fortune and Davis left the store, three black males, who Fortune recognized from the neighborhood, approached.  Id. ¶ 15.  He knew one as "Lindsay" and another as "Yellow," but did not know the name of the third.  Id.  Plaintiff disputes whether Fortune in fact identified one of the men as "Lindsay" because, although the report of the interview with Fortune records him as referring to "Lindsay," Fortune's handwritten statement spells the name of the person referred to as "Lezzy."  Pl. Facts ¶ 15; Pollack Decl., Ex. N.  After all three men gave Davis a "pound," Yellow told Davis that the "beef is dead," and Davis walked with the three men in a different direction from Fortune, though plaintiff disputes whether the defendants' precise description of the directions that the men took can be supported by the referenced statements.  Defs. Facts ¶¶ 16-17; Pl. Facts ¶ 17.  Davis and the three other men stopped and talked together for approximately five minutes.  Defs. Facts ¶¶ 17-18.

Relying on the police report of Detective Braithwaite's interview with Fortune and Fortune's written statement, defendants assert that Fortune gave police the following account of what happened next.  Fortune stated that he heard a gunshot and looked back to where he saw plaintiff holding a black object in his hand, which was extended toward Anthony Davis.  Id. ¶ 19.  He stated that he saw sparks coming out of the black object in plaintiff's hand.  Id. ¶ 20.  He told Detective Braithwaite that he then saw Davis attempt to run away from plaintiff but fall before

he could get very far away.  Id. ¶ 21.  He said that Davis then made it back to his feet and ran

westbound on Church Avenue toward Fortune as Fortune also ran toward Davis.  Id. ¶¶ 23-24.

He stated that Davis fell face down in front of 3407 Church Avenue, where Fortune turned him

onto his back and found that he was unresponsive.  Id. ¶ 25-27.  He told police that, at that point,

people came out of a nearby barber shop to assist Davis, including a man who said that he was a

doctor, and eventually an ambulance arrived.  Id. ¶¶ 28-29.  Although plaintiff disputes whether

Fortune's written statement referred to by defendants supports these facts, he does not deny that

the police report of the interview with Fortune relates these statements by Fortune almost

verbatim.  Pl. Facts ¶¶ 19-25.

At plaintiff's trial for the murder of Anthony Davis, Fortune testified that, prior to his

interview and written statement given to police on November 24, 2006, he was taken to the 67th

Precinct and spoke with police officers there on the morning of November 23, 2006, around 7:00

or 8:00 a.m, possibly as late as 9:00 a.m.  Pollack Decl., Ex. P, at 334.  He testified that, at that

time, police questioned him concerning the shooting of Anthony Davis, and he told them what he

knew about the shooting.  Id. at 336.  Although plaintiff disputes whether this meeting on

November 23, 2006, in fact occurred, he provides no evidence to contradict Fortune's testimony

that he met with police on that day and told them what he knew.  Pl. Facts ¶ 31.

On November 23, 2006, Detective Braithwaite interviewed Junior Noel, who stated that

he and his brother heard gunshots while in a barber shop across the street from where Anthony

Davis was shot on November 22.  Pollack Decl., Ex. O.  He stated that he called "911" while his

brother, who is a doctor, went outside to help.  Id.

On December 6, 2006, at 12:00 p.m., Detectives Braithwaite and O'Brien showed Fonzie Fortune a photo array, which they had prepared with an image of plaintiff in position number one, and Fortune identified plaintiff as the person who shot Anthony Davis.  Defs. Facts ¶¶ 33-35.  Fortune signed his name and the date under the photograph of the person he identified as the shooter.  Id. ¶ 36

Relying on his own sworn affidavit, plaintiff asserts that he was "under police custody and control" from the time he entered Coney Island Hospital.  Pl. Facts ¶ 45.  According to plaintiff, NYPD officers were present inside his hospital "during the period from November 22 until December 1."  Id. ¶ 46.  However, he does not clarify whether that presence was continuous or whether there were certain times during that period that they were present.  Furthermore, he asserts that members of the NYPD interrogated him at least three times about Anthony Davis during the "first few critical hours" of his time at the hospital.  Id. ¶ 44.  On November 23, 2006, plaintiff underwent surgery for the gunshot wound to his knee, and when he awoke from surgery (drawing all inferences in plaintiff's favor, presumably that same day) he was handcuffed to his hospital bed by members of the NYPD.  Id. ¶¶ 47-48.  According to plaintiff's affidavit, when plaintiff's family members and friends attempted to visit him while he was recovering at Coney Island Hospital, members of the NYPD informed them that he was under arrest.  Id. ¶ 49.

According to plaintiff, on November 23, 2006, Police Officer A. Contessa, who is not a defendant in this case, seized the clothes that plaintiff was wearing when he was shot.  Id. ¶ 50.  He also states that defendant Detective Braithwaite seized the clothes he was wearing when he was shot on November 30, 2006.  Id. ¶ 51.

Plaintiff was taken into police custody upon his release from Coney Island Hospital on December 1, 2006.  Defs. Facts ¶ 37; Pl. Facts ¶ 52.  He was thereafter indicted by a grand jury and charged with murder in the second degree, criminal possession of a weapon in the second degree, and assault in the second degree.  Defs. Facts ¶ 38.  After a jury trial, he was acquitted of all charges.  Pl. Facts ¶ 39.

## DISCUSSION

### A.   Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The function of the court is not to resolve disputed issues, but to determine whether there is a genuine issue to be tried.  Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 249 (1986).  "While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law."  McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)) (internal quotation marks and ellipses omitted).

In assessing whether summary judgment is appropriate, the court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits."  Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011) (quoting In re Bennett Funding Grp., Inc., 336 F.3d 94, 99 (2d Cir. 2003)); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party carries the burden of

proving that there is no genuine dispute respecting any material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."  Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994). Once this burden is met, in order to avoid the entry of summary judgment, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998).  In reviewing the record before it, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

## B.    Preliminary Evidentiary Matters

Before turning to the merits of defendants' motion, the Court must address a preliminary matter raised by plaintiff as to whether the Court may consider the materials submitted in support of defendants' motion.  Pursuant to Federal Rule of Civil Procedure 56(c)(2), plaintiff objects to defendants' reliance on Exhibits A, C, D, E, F, G, H, I, J, K, L, M, N, O, Q, R, S, T, and U annexed to the Declaration of David M. Pollack, which are all police reports, on the asserted grounds that they are inadmissible hearsay documentary evidence.[1]  While it is indeed frustrating that defendants' motion is supported almost entirely by police reports rather than depositions or affidavits, such police reports are, contrary to plaintiff's contention, admissible for purposes of a summary judgment motion in this case.

Police reports themselves may be admissible under the Federal Rules of Evidence either

---

[1] Plaintiff further objects to these documents on the grounds that many of them were not disclosed in defendants' initial disclosures, and particularly that Exhibit F was never disclosed during discovery.  Since plaintiff himself disclosed the bulk of the exhibits as to which he makes this claim, it is hard to imagine how he could have been prejudiced in responding to defendants' use of these documents in their motion.  While it is more troubling that Exhibit F allegedly was never disclosed by either side, plaintiff has not indicated how this has prejudiced him in any way or how he would have been better able to respond to defendants' motion had he had access to this document earlier.

as business records, Fed. R. Evid. 803(6), or as public records, Fed. R. Evid. 803(8).  Cooper,

925 F. Supp. 2d at 605; United States v. Carneglia, 256 F.R.D. 384, 391 (E.D.N.Y. 2009); see

also Parsons v. Honeywell, Inc., 929 F.2d 901, 907 (2d Cir. 1991) ("police report itself"

admissible as a public record).  As to authentication, under Federal Rule of Evidence 901(a),

authentication may be provided by "evidence sufficient to support a finding that the item is what

the proponent claims it is."  As an example, Federal Rule of Evidence 901(b)(7) provides that

public records such as police reports may be authenticated by "[e]vidence that:  (A) a document

was recorded or filed in a public office as authorized by law; or (B) a purported public record or

statement is from the office where items of this kind are kept."  See also Carneglia, 256 F.R.D. at

391.  The threshold for authentication is "relatively low," particularly in the absence of a specific

challenge to the authenticity of a document by the opposing party.  Lachira v. Sutton, No.

3:05cv1585(PCD), 73 Fed. R. Evid. Serv. 536, 2007 WL 1346913, at *2-3 (D. Conn. May 7,

2007) (quoting Bazak Int'l Corp. v. Tarrant Apparel Grp., 378 F. Supp. 2d 377, 391-92

(S.D.N.Y. 2005)).  The declaration of David M. Pollack, as Assistant Corporation Council to the

City of New York, and thus counsel for the police department from which the reports come,

contains statements based on his personal knowledge and sufficiently presents a "reasonable

likelihood" that the documents are what they purport to be.  United States v. Pluta, 176 F.3d 43,

49 (2d Cir. 1999).  Plaintiff has provided no evidence whatsoever to cast doubt on the likelihood

of their authenticity.

   As to any statements of witnesses contained in the police reports, such statements are not

inadmissible hearsay where they are not offered for the truth of the matter asserted but for

purposes of establishing whether the arresting officers had information giving them probable

cause.  Williams v. City of N.Y., No. 10-CV-2676 (JG)(LB), 2012 WL 511533, at *3 n.2

(E.D.N.Y. Feb. 15, 2012); Batson-Kirk v. City of N.Y., No. 07-CV-1950 (KAM)(JMA), 2009 WL 1505707, at *5 (E.D.N.Y. May 28, 2009). A statement is admissible non-hearsay when it is offered as evidence of the effect of a statement on the listener, the knowledge motivating his actions, or his state of mind at the relevant point in time. See United States v. Puzzo, 928 F.2d 1356, 1365 (2d Cir. 1991). Accordingly, the witness statements in the police reports may be considered for such purposes in this case.

## C.   False Arrest and Imprisonment

The Court now turns to plaintiff's first substantive claim for false arrest and imprisonment.[2] A § 1983 claim for false arrest, asserting a deprivation of the Fourth Amendment right to be free from unreasonable seizures, is "substantially the same" as a claim for false arrest under New York state law. Weyant v. Okst, 101 F.3d 845, 852 (2d. Cir. 1996). The plaintiff must prove (1) that the defendant intentionally confined plaintiff, (2) that plaintiff was conscious of the confinement and did not consent to it, and (3) that the confinement was not otherwise privileged. See Jocks v. Tavernier, 316 F.3d 128, 134-35 (2d Cir. 2003) (quoting Broughton v. State, 335 N.E.2d 310, 314 (N.Y. 1975)); Harris v. Cnty. of Nassau, 581 F. Supp. 2d 351, 355 (E.D.N.Y. 2008). If officers had probable cause to arrest plaintiff, then the confinement is privileged. Jocks, 316 F.3d at 135. Therefore, the existence of probable cause constitutes a complete defense to a § 1983 false arrest claim. Covington v. City of N.Y., 171 F.3d 117, 122 (2d Cir. 1999) (quoting Weyant, 101 F.3d at 852).

### 1.   *Timing of Plaintiff's Confinement*

Although neither party disputes the fact that plaintiff was at some point arrested, the

---

[2] Plaintiff also maintains a separate Fourth Amendment claim for unlawful search and seizure. See Dkt. #32. However, there appears to be no distinction between such a claim and plaintiff's false arrest claim in this case. Accordingly, defendants address both claims under the title of false arrest, and plaintiff's papers appear to implicitly concede that these two claims should be addressed as one.

parties disagree as to the point in time at which plaintiff was confined without his consent for purposes of a § 1983 false arrest claim.  The timing of plaintiff's confinement is significant for purposes of evaluating probable cause at the relevant time.  Since defendants concede that plaintiff was arrested at least by December 1, 2006, the Court must examine whether there is a material issue of fact as to whether plaintiff was confined prior to that date.

For a confinement, neither New York law nor § 1983 require that a formal arrest have occurred.  Damiano v. City of Amsterdam, 466 F. Supp. 2d 456, 460 (N.D.N.Y. 2006) (citing Posr v. Doherty, 944 F.2d 91, 96-97 (2d Cir. 1991)).  However, "not all personal intercourse between policemen and citizens involves 'seizures' of persons.  Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may [a court] conclude that a 'seizure' has occurred."  I.N.S. v. Delgado, 466 U.S. 210, 215 (1984) (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)).  For an actionable confinement under § 1983 to exist, a plaintiff must show that "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  United States v. Mendenhall, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.); see also Gardiner v. Inc. Vill. of Endicott, 50 F.3d 151, 155 (2d Cir. 1995).  Factors that courts in the Second Circuit may consider include:  the threatening presence of multiple officers, the display of a weapon, physical contact by an officer, language indicating that compliance with the officer is compulsory, prolonged retention of a person's belongings, or a request by an officer that a person accompany him or her to the police station or a police room.  Gardiner, 50 F.3d at 155; United States v. Glover, 957 F.2d 1004, 1008 (2d Cir. 1992).

       i.       November 22

In support of his claim that he was confined beginning on November 22, 2006, when he

arrived at Coney Island Hospital shortly before 8:00 p.m., plaintiff relies on little more than his own conclusory assertions that he was "unlawfully detained" that day and that he was "under police custody and control from the time [he] entered Coney Island Hospital" that evening.  Pl. Decl. ¶¶ 2, 7.  See Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) (conclusory assertions unsupported by specific facts cannot overcome summary judgment motion). He asserts that "various members of the NYPD were present inside of [his] hospital room" during the period starting on the evening of November 22, Pl. Decl. ¶ 8, but he provides no specific facts as to which officers were present at what time on November 22.  Nor does he allege any specific facts to indicate that the unidentified officers' presence was threatening.  Instead, he states only that Detectives O'Brien and Walker "interrogated" him "at least three times about Anthony Davis" during "the first few critical hours" of his time in the hospital, which presumably refers to the hours after he arrived on November 22.  Id. ¶ 6. However, "mere police questioning does not constitute a seizure." Muehler v. Mena, 544 U.S. 93, 101 (2005) (quoting Florida v. Bostick, 501 U.S. 429, 434 (1991)); see also Delgado, 466 U.S. at 216-17.  Without more, plaintiff has raised no triable issue as to whether, in questioning him, it was the officers' intent to confine him.  Cf. Damiano, 466 F. Supp. 2d at 461-62 (summary judgment granted for defendants where plaintiff failed to adduce facts indicating that, in asking him to come to police station, officers intended to confine him).  Certainly, plaintiff may not have felt free to leave the hospital on November 22 in the sense that he felt compelled to stay there for medical reasons to have his knee wound treated, but he went to the hospital for medical treatment of his own free will.  There are no facts indicating that it was the police officers' conduct (as opposed to his medical condition and desire for proper medical treatment) that restrained him from leaving the hospital on the night of November 22.  It would set dangerous precedent to allow a false arrest claim to

proceed whenever a police officer does no more than question a gunshot victim inside a hospital about a shooting.

On this basis, the Court concludes that plaintiff was not confined on the evening of November 22.

    ii.    <u>November 23</u>

With regards to November 23, plaintiff has adduced sufficient specific facts such that a rational trier of fact might very well conclude that he was confined that day, but he has alleged no facts regarding the conduct of the individual named defendants on that day.  In his affidavit, plaintiff states that he received surgery for his knee wound on November 23, 2006, and that members of the NYPD handcuffed him to his hospital bed when he woke up from the surgery.[3] Pl. Decl. ¶¶ 9-10.  However, plaintiff states that he is unaware which officer was responsible for handcuffing him to the bed.  <u>Id.</u> ¶ 10.  He also asserts that, on November 23, Police Officer A. Contessa of the NYPD 60th Precinct seized the clothes that he was wearing when he was shot. <u>Id.</u> ¶ 12.  These factual allegations taken together could lead a reasonable juror to conclude that plaintiff was confined on November 23.

Problematically, however, plaintiff has alleged no specific facts connecting these occurrences with the conduct of the four remaining named defendants.  To succeed on a § 1983 claim, a plaintiff must allege that each defendant was directly and personally involved in the purported unlawful conduct.  <u>E.g.</u>, <u>Lovanyak v. Cogdell</u>, 955 F. Supp. 172, 174 (E.D.N.Y. 1996); <u>Schmelzer v. Norfleet</u>, 903 F. Supp. 632, 634 (S.D.N.Y. 1995); <u>Herrera v. Scully</u>, 815 F. Supp. 713, 722 (S.D.N.Y. 1993).  In his complaint, plaintiff alleges that "[p]olice officers investigating this shooting, including [the four individual defendants], at times acting in concert and at times

---

[3] Plaintiff does not specify the date on which he awoke from the surgery, but the court nonetheless makes the inference in his favor that it was on the same day as the surgery

acting independently, committed the following illegal acts against plaintiff."  Compl. ¶ 13.  This blanket statement in no way identifies which specific officer was responsible for what conduct or even when they were present while such conduct occurred, and even now after discovery plaintiff provides no more specific facts personally and directly connecting the individual defendants to the potentially unlawful conduct that allegedly occurred on November 23. Nonetheless, even assuming that this blanket allegation creates a sufficient inference that all four defendants were present if not in fact involved in plaintiff's alleged seizure on November 23, probable cause to arrest plaintiff existed on November 23, as will be discussed below.

   iii. <u>November 30</u>

   Although not discussed in detail by either party, plaintiff has adduced specific facts indicating that one of the named defendants might have been responsible for specific conduct constituting a Fourth Amendment seizure on November 30, 2006.  Plaintiff's affidavit states that, on that date, defendant Detective Braithwaite seized the clothes that plaintiff was wearing when he was shot.  Pl. Decl. ¶ 13.  Particularly taken together with the fact that plaintiff asserts that he had been handcuffed to his bed by this point, Detective Braithwaite's conduct could reasonably be found to be a seizure.  However, such statements allege the personal involvement of Detective Braithwaite only, not the other individual defendants, and furthermore, as will be discussed below, probable cause existed at that time.

   **2.** ***Probable Cause***

   The existence of probable cause may be determined as a matter of law on summary judgment where there is no material dispute as to the relevant events and knowledge of the officers.  <u>See</u> <u>Weyant</u>, 101 F.3d at 852.  Probable cause to arrest exists when law enforcement officers "have knowledge or reasonably trustworthy information of facts and circumstances that

are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested

has committed or is committing a crime."  Posr v. Court Officer Shield No. 207, 180 F.3d 409,

414 (2d Cir. 1999) (quoting Weyant, 101 F.3d at 852).  In evaluating the existence of probable

cause, courts "consider the facts available to the officers at the time of the arrest."  Ricciuti v.

N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997).  The so-called "imputed knowledge

doctrine" allows a police officer making a probable cause determination "to rely on the

allegations of fellow police officers" in the absence of significant evidence to the contrary.

Spears v. City of N.Y., No. 10-CV-03461, 2012 WL 4793541, at *6 (E.D.N.Y. Oct. 9, 2012)

(quoting Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006)).

Defendants submit the following evidence in support of the existence of probable cause

by the time of any act of seizure on November 23.  By the wee hours of the morning on

November 23, Keith Moore, who had brought plaintiff to the hospital, admitted to police that he

had fabricated the story related by both he and plaintiff about how plaintiff had been shot.  Def.

Facts ¶¶ 9-12.  Moore also told police that plaintiff had instructed him to lie because he did not

want to tell the truth about the circumstances of his gunshot wound.  Id. ¶ 10.  Moore's

admissions were further corroborated by the fact that, by the morning of November 23, police

had found no evidence of a gunfight in the parking lot where plaintiff allegedly had been shot

and no one in the area had seen or heard any gunshots.  Id. ¶¶ 7-8.  At trial, Fonzie Fortune, who

identified "Lindsay" as Anthony Davis's shooter, testified that also by the morning of November

23 no later than 9:00 a.m. he had told police his eyewitness version of how Anthony Davis was

shot.[4]  Pollack Decl., Ex. P, at 334-36.  "When information is received from a putative victim or

---

[4] Plaintiff appears to contest whether the information that Fortune gave police could have provided probable cause
given that Fortune's written statement, Pollack Decl., Ex. N., refers to "Lezzy" as opposed to "Lindsay."
Contemporaneous police reports record Fortune as referring to "Lindsay," id., Ex. M., and the Court is not inclined
to give particular significance to the phonetically oriented spelling of a witness who also spells "towards" as

an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's

veracity." Curley v. Vill. of Suffern, 268 F. 3d 65, 70 (2d Cir. 2001) (internal citation omitted).

Plaintiff has asserted no facts whatsoever indicating that, at the time police interviewed Fortune

on the morning of November 23, the police officers should have had any doubt as to his

veracity.[5]  See Guerrero v. City of N.Y., No. 12 Civ. 2916, 2013 WL 673872, at *4 (S.D.N.Y.

Feb. 25, 2013) ("In cases where a plaintiff attempts to plead false arrest despite the existence of a

complaining victim or witness, the plaintiff must, at the very least, allege facts tending to show

that the victim's veracity should have been questioned.").  By November 23, Fortune's

statements had been lent further credibility by the statements of Junior Noel, who corroborated

Fortune's account of what happened after Davis was shot.  Any inconsistencies or doubts as to

Fortune's testimony that arose at trial are irrelevant in the evaluation of probable cause.  See

Devenpeck v. Alford, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon

the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of

the arrest."); Peterson v. Cnty. of Nassau, 995 F. Supp. 305, 313 (E.D.N.Y. 1998) ("[T]he court

looks only to the information that the arresting officer had at the time of the arrest.").  The

"totality of the circumstances" known to police by the time plaintiff was arguably seized on

November 23---including Fortune's identification of a black male named "Lindsay" who he

knew from the neighborhood as the shooter and Moore's admission that they had fabricated a

---

"thords" and uses nicknames to refer to other individuals mentioned in his statement (e.g., "Ant" for Anthony Davis).

[5] In his Local Rule 56.1 fact statement, plaintiff points to some inconsistencies in Fortune's testimony at trial. Pl. Facts ¶¶ 60-63. At trial on September 9, 2008, when asked on direct examination whether he had seen who shot Anthony Davis, Fortune responded, "I can't really make it clear. It was dark." Decl. of Michael P. Kushner ("Kushner Decl."), Ex. 2, at 208-09. At that point, the prosecution sought permission from the presiding judge to impeach Fortune with his inconsistent prior taped statement and sworn grand jury testimony. Id. at 209-16. Although it is not entirely clear from the record what resulted from discussions regarding the witness's prior inconsistent statements, Fortune returned to the stand for direct examination on September 11, 2008, and identified plaintiff as the shooter. Kushner Decl., Ex. 3, at 263. Regardless, any doubts cast on Fortune's credibility at trial are not relevant to an evaluation of probable cause at the time of arrest.

story about where plaintiff had been shot because plaintiff did not want to reveal the real location, which was extremely close to the location of Anthony Davis's shooting---sufficiently warranted a reasonable officer in the belief that plaintiff had been involved in the gun violence surrounding Davis's death.

As discussed above, plaintiff has presented almost no evidence that could allow a reasonable juror to conclude that the individual defendants were personally involved in any conduct constituting a Fourth Amendment seizure on November 23.  Nonetheless, to the extent any of the defendants did take part in such a seizure, defendants have met their burden of showing that there are no material fact issues as to whether probable cause existed by the time such a seizure occurred on November 23.  Going forward after November 23, to the extent that any of the defendants took part in a Fourth Amendment "seizure," there was an even stronger basis for probable cause in light of Fortune's recorded interview and written statement from November 24.

The Court notes that, even were there a doubt as to the availability of summary judgment as to the existence of probable cause on November 23, there was most certainly at a minimum arguable probable cause giving rise to qualified immunity.  "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."  Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted).  Summary judgment may be granted on the basis of qualified immunity only where "no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law."  Felmine v. City of N.Y., No. 09-CV-3768 (CBA)(JO), 2011 WL 4543268, at *10 (E.D.N.Y.

Sept. 29, 2011) (quoting <u>Ford v. Moore</u>, 237 F.3d 156, 162 (2d Cir. 2001)).  In light of the undisputed evidence described above, this is such a case.

Accordingly, defendants have met their burden, and summary judgment is granted on plaintiff's false arrest claim.

**D.**     **<u>Malicious Prosecution</u>**

Like his false arrest claim, plaintiff's malicious prosecution claim pursuant to § 1983 draws its elements from state law.  <u>Boyd v. City of N.Y.</u>, 336 F.3d 72, 75 (2d Cir. 2003).  Under New York law, a successful malicious prosecution claim requires a plaintiff to prove that:  (1) the defendant initiated or continued a criminal proceeding against plaintiff; (2) the proceeding terminated in plaintiff's favor; (3) there was no probable cause for the criminal charge; and (4) the defendant acted with malice.  <u>Rothstein v. Carriere</u>, 373 F.3d 275, 282 (2d Cir. 2004).  Here, there is no dispute that the criminal proceeding terminated favorably to plaintiff when he was acquitted after trial, but his claim nevertheless fails on the other three elements.

To initiate or continue a prosecution, a defendant must take "an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." <u>Rohman v. N.Y.C. Transit Auth.</u>, 215 F.3d 208, 217 (2d Cir. 2000) (quoting <u>DeFilippo v. Cnty. of Nassau</u>, 583 N.Y.S.2d 283, 284 (App. Div. 1992)).  In an action brought against a law enforcement officer, "a malicious-prosecution claim cannot stand if the decision made by the prosecutor to bring criminal charges was independent of any pressure exerted by police." <u>Hartman v. Moore</u>, 547 U.S. 250, 263 (2006) (citing <u>Dellums v. Powell</u>, 566 F.2d 167, 192-93 (D.C. Cir. 1977)). A successful claim against a police officer requires some showing that the defendant "distorted the process by which [plaintiff] was brought to trial, and an officer who does no more than disclose to a prosecutor all material information within his knowledge is not

deemed to be the initiator of the proceeding." Husbands v. City of N.Y., No. 05 Civ.

9252(NRB), 2007 WL 2454106, at *9 (S.D.N.Y. Aug. 16, 2007) (quoting Present v. Avon

Prods., Inc., 687 N.Y.S.2d 330 (App. Div. 1999)) (internal quotation marks omitted).  In prior

cases against law enforcement officers, plaintiffs have overcome the presumption that a

prosecutor exercises independent judgment in deciding whether to initiate a criminal proceeding

where they have shown that the officer either (1) created false information and forwarded it to

prosecutors or (2) withheld relevant and material information.  Mitchell v. Home, 434 F. Supp.

2d 219, 227 (S.D.N.Y. 2006).  Plaintiffs have also succeeded where they demonstrated that the

officer initiated the proceeding by having the plaintiff arraigned, filling out complaining and

corroborating affidavits, or signing sworn felony complaints.  Id.; Felmine, 2011 WL 4543268,

at *11.

        In his complaint, plaintiff asserts that the defendants (he does not specify which ones)

influenced prosecutorial decision-making by submitting false statements and information to the

prosecutor that caused criminal proceedings to be initiated.  He states:

> While plaintiff was incarcerated at the 67[th] Precinct and Central Booking awaiting
> arraignment defendants, pursuant to a conspiracy, falsely and maliciously told the
> Kings County District Attorney's Office that plaintiff had committed a crime; and
> based on these false allegations the Kings County District Attorney's Office
> initiated a prosecution against plaintiff . . . .
>
> To cover up their misconduct, the defendant police officers intentionally,
> knowingly and purposely provided false statements and information to cause
> plaintiff to be prosecuted.

Compl. ¶¶ 25-26.  In his opposition papers, he summarily states that the initiation prong of his

claim is satisfied without any further explanation.  He provides no specific facts about what false

information was provided by whom, much less any evidence to support his conclusory

assertions.

What is more, plaintiff does not point to any facts indicating that the defendant officers participated in the initiation of formal criminal proceedings by signing sworn complaints or filling out corroborating affidavits.  All that is before the Court on the record are police reports indicating that the defendant officers conducted witness interviews and investigated the shooting and that ultimately plaintiff was arrested.

Here, plaintiff has introduced no evidence to rebut the presumption that the prosecutor exercised independent judgment in initiating his prosecution or that the defendants in any way influenced that decision other than by turning over all investigatory material within their knowledge.  On this basis alone, plaintiff's claim of malicious prosecution must fail.

However, even if defendants were found to be responsible for initiating plaintiff's prosecution, their motion for summary judgment would nonetheless be granted on the grounds that, as discussed for plaintiff's false arrest claim, there was probable cause for the charges against plaintiff.

In the context of a malicious prosecution claim, probable cause also exists in the presence of "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." Boyd, 336 F.3d at 76.  A grand jury indictment "creates a presumption of probable cause." Rothstein, 373 F.3d at 282-83 (quoting Colon v. City of N.Y., 455 N.E.2d 1248 (N.Y. 1983)).  "[I]n order for a plaintiff to succeed on a malicious prosecution claim after having been indicted, he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." Id. (internal quotation marks omitted).  Plaintiff bears the burden of rebutting probable cause after an indictment, and "mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith" is not enough to satisfy his burden.  Savino v. City of

N.Y., 331 F.3d 63, 73 (2d Cir. 2003) (quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991)).

Here, plaintiff has presented no specific facts from which a factfinder could infer misconduct by defendants, much less misconduct that had any material effect on the grand jury indictment. Felmine, 2011 WL 4543268, at *12 (misconduct by police must be "proximate cause" of indictment). A conclusory assertion in the complaint that defendants made false statements will not suffice. Moreover, to the extent that plaintiff's claims are based on any statements made by defendants in testimony before the grand jury, defendants are entitled to absolute immunity from any claim based on that testimony. See Rehberg v. Paulk, 132 S. Ct. 1497, 1505-07 (2012).

As discussed above, the combination of Fonzie Fortune's statements made on the morning of November 23, which were lent credibility by Junior Noel's statements, and the information officers obtained regarding the circumstances of plaintiff's own gunshot wound provided probable cause. By the time plaintiff was indicted, probable cause was further supported by Fortune's identification of plaintiff in the December 6 photo array. In light of this evidence, no reasonable jury could conclude that the prosecution lacked probable cause.

Finally, there is no evidence in the record of actual malice, which requires a showing by plaintiff that defendants had "a wrong or improper motive, something other than a desire to see the ends of justice served." Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996) (quoting Nardelli v. Stamberg, 377 N.E.2d 975, 976 (N.Y. 1978)). Plaintiff's sole argument is that malice can be inferred from their arrest of plaintiff without probable cause. While lack of probable cause "generally raises an inference of malice sufficient to withstand summary judgment," Ricciuti, 124 F.3d at 131, this Court has already found that there was probable cause

for the prosecution such that it cannot be inferred on that basis.  Plaintiff points to no facts in the record indicating that defendants acted with an improper motive.

Accordingly, summary judgment in favor of defendants is also granted with respect to plaintiff's malicious prosecution claim.

**E.      Denial of Medical Treatment**

As to his final remaining claim, plaintiff argues that defendants deliberately interfered with his medical treatment while at Coney Island Hospital in order to interrogate him about the shooting death of Anthony Davis.  Opp'n 13.  In his affidavit, plaintiff asserts:

> Members of the New York City Police Department interfered with my treatment at Coney Island Hospital.  Specifically, Detective O'Brien and Detective Walker, the defendants in this action, interfered with my medical treatment at Coney Island Hospital by interrogating me about the shooting death of Anthony Davis. During the first few critical hours of my time at Coney Island Hospital, I was interrogated at least three times about Anthony Davis.

Pl. Decl. ¶ 6.  Plaintiff provides no specifics as to precisely how this "interrogation" prevented him from being treated for his knee wound either in those "first few critical hours" or at any point thereafter.  Plaintiff alleges other facts related to interference by New York City Department of Corrections officers with his medical treatment after his arrest when he was a detained at Rikers Island, id. ¶¶ 16-17, but there is no indication that defendants were in any way involved with any events at Rikers Island.

First, the Court must note that plaintiff nowhere alleges that defendants Ducceschi or Braithwaite participated or even were present during these events, and thus any claim against them must fail for lack of personal involvement.  Second, the Court notes that, as discussed above, plaintiff has not provided any material evidence that he was confined until after he awoke from surgery on November 23, 2006, and was handcuffed to the bed, and thus the defendants owed him no duty as a detainee prior to that time.

Nonetheless, even assuming that plaintiff became a pre-trial detainee the moment he entered Coney Island Hospital, his medical treatment claim against the defendants fails as a matter of law.  As a pre-trial detainee, plaintiff's claim is brought under the Due Process Clause, for which the applicable analysis is virtually identical to that for deliberate indifference claims under the Eighth Amendment.  Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000); Weyant, 101 F.3d at 856.  To succeed on a deliberate indifference claim against an official custodian of a pre-trial detainee, plaintiff must show that "the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." Weyant, 101 F.3d at 856.  This standard involves both objective and subjective elements: "Objectively, the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists.  Subjectively, the charged official must act with a sufficiently culpable state of mind." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996) (internal quotation marks and citation omitted).

Here, plaintiff cannot satisfy either prong.  As to the sufficiently serious deprivation factor, plaintiff has submitted no evidence of a deprivation whatsoever.  By his own admission, he received surgery for the gunshot wound to his knee on November 23, 2006, less than a day after he was shot.  Pl. Decl. ¶ 9.  He points to nothing that would indicate defendants either delayed his surgery or caused it to be rescheduled.  Nor does he point to anything to indicate that the questioning by detectives prevented him from receiving treatment or was otherwise inconsistent with his treatment at the hospital.  No rational factfinder could conclude from the record that there was a sufficiently serious deprivation of medical treatment.  As to the subjective factor of "deliberate indifference," there is nothing in the record that would permit a rational trier of fact to find that defendants were aware of and disregarded any risk to plaintiff.  See Felmine,

23

2011 WL 4543268, at *21 (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994)) ("[D]efendant [must] actually 'know[] of and disregard [] an excessive risk to . . . health or safety.'").  Prior to plaintiff's surgery on November 23, the information regarding his medical treatment of which NYPD officers were aware was that he was in stable condition and would be scheduled for surgery, though when the surgery would be scheduled had not been determined by late night on November 22.  Pollack Decl., Ex. C.  Plaintiff points to nothing in the record to indicate that defendants were aware of any risk to his health or safety or any delay to his surgery that would be caused by questioning him at that time.

Therefore, summary judgment is also granted on plaintiff's interference with medical treatment claim.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety, and all of plaintiff's remaining claims are dismissed.  The Clerk of Court is directed to enter judgment accordingly and close the case.


SO ORDERED.


                                             _/s/_____
                                             Allyne R. Ross
                                             United States District Judge


Dated:          January 13, 2014
                Brooklyn, New York